**Jacqueline FORD, as Administratrix of the Estate of Robert Ford, deceased, and individually, Plaintiff–Appellee,**

v.

**Edward F. MOORE, individually and as a Lieutenant (agent and/or employee) of the Saratoga Springs Police Department, and Thomas W. Mitchell, individually and as a Lieutenant (agent and/or employee) of the Saratoga Springs Police Department, Defendants–Appellants.**

Nos. 99–9303L, –9305(CON), –9315(CON).

United States Court of Appeals, Second Circuit.

Argued Oct. 16, 2000.

Decided Jan. 8, 2001.

Daniel J. Stewart, Dreyer Boyajian LLP, Albany, NY, on the brief, for defendant-appellant Edward F. Moore.

James B. Tuttle, Bohl, Della Rocca & Dorfman, P.C., Albany, NY, on the brief, for defendant-appellant Thomas W. Mitchell.

Kent J. Gebert, Schenectady, NY, on brief, for plaintiff-appellee.

Before MESKILL, JON O. NEWMAN, and CABRANES, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal by two supervisory police officers concerns their claim of qualified immunity in a case in which subordinate officers intervened in an attempt to avert the apparently imminent suicide of a distraught young man armed with a rifle. The young man was ultimately killed by a bullet fired, under disputed circumstances, from the pistol of one of the subordinate officers. Lt. Edward F. Moore and Lt. Thomas W. Mitchell of the Saratoga Springs, N.Y., Police Department appeal from the portion of the September 30, 1999, order of the District Court for the Northern District of New York (Lawrence E. Kahn, District Judge), that denied their motion to dismiss, on the ground of qualified immunity, a suit brought by the decedent's administratrix against them and others. The District Court's ruling rejected motions for summary judgment by various defendants but did not explicitly consider the Appellants' qualified immunity defense. We conclude that we should adjudicate the merits of the Appellants' qualified immunity defense, notwithstanding the lack of explicit consideration by the District Court, and that the defense should be upheld as a matter of law. We therefore reverse and remand with directions to dismiss the complaint against the Appellants.

### Background

I. The Episode

The facts pertinent to a disposition of this appeal are those set forth in the Plain-

tiff–Appellee's complaint as well as those submitted by the Defendants–Appellants that are not disputed by the Plaintiff. In the account that follows, any matters that are in dispute are identified as such.

On the evening of June 15, 1995, Robert Ford ("Ford"), a 20–year–old African–American, wrote two notes to his girlfriend Sommer Bethel ("Bethel") threatening to commit suicide and indicating that he could be found at a local outdoor recreational field. Bethel went to the police station, where at around 12:20 A.M., Lt. Moore, the ranking officer in charge of the police department that night, dispatched patrol officer Christopher Kuznia to search the field.

Kuznia drove to the field, but could not find Ford. He returned to the station and picked up patrol officer Daniel Mullan. The two officers drove to Bethel's residence, where Ford lived. While at the Bethel residence, the officers came upon another note written by Ford, this one accusing Bethel of not "having looked too hard" for him earlier at the recreation field, and calling her a name.

The officers then returned to the field, arriving at approximately a few minutes after 1 A.M. There they found a friend of Ford's who informed them that Ford was in a dugout at the baseball field, holding a rifle and ammunition. Kuznia radioed headquarters for backup. Moore dispatched Sergeant John King, an officer with mental health training, to the scene. Three other officers, Sergeant Michael Welch, Investigator David Levanites, and Patrolman Joseph Carey, were also dispatched. The four officers arrived at the field, and Sergeant Welch radioed for an ambulance to park at a stand-by location with its siren turned off.

Kuznia found Ford sitting in the dugout of the baseball field and observed that Ford had a rifle pointed at his own chin with the safety disengaged. He asked Ford for permission to sit with him in the dugout. Ford told Kuznia that he could come inside, and that Ford would not shoot him.

Ford then asked Kuznia if he could talk to Bethel, and when Kuznia refused unless Ford relinquished his rifle, Ford grew agitated. After Kuznia made excuses to get closer to Ford and engage him in conversation, Ford asked Kuznia for a cigarette, which Kuznia supplied. A short time later, Kuznia determined that Ford was about to shoot himself. Kuznia gestured to Mullan, who was outside the dugout, and counted from three down to zero with his fingers as a signal to disarm Ford. When he reached zero, Kuznia and Mullan together grabbed for the rifle.

As Ford, Kuznia, and Mullan struggled, the officers managed to keep the rifle pointed away from all members of the trio. However, Ford was able to get his finger on the trigger and discharge one round from the rifle. The bullet went out of the dugout, harming no one. As the struggle between Ford and the officers continued, Ford bit Kuznia's arm. Mullan finally seized the rifle, and so informed the other officers at the scene.

The parties dispute what happened next. According to the officers on the scene, Kuznia and Ford continued to fight. Kuznia had Ford in a headlock, but Ford was still biting Kuznia. Kuznia wrestled Ford down to the dugout bench, ending up on top of Ford. At that moment, Levanites, who was at the entrance to the dugout, saw a "glimpse of silver." A second shot rang out, and Ford, bleeding profusely from a wound to the head, stopped struggling. Levanites felt a flash of pain in his leg, thinking he was hit. Kuznia looked down, and saw that his sidearm was missing from its holster. The officers' conclusion, reflected in reports written later that day, is that Ford somehow got hold of Kuznia's pistol and shot himself.

The Plaintiff disputes the officers' account of how the second shot occurred. She relies on the opinions of experts who reached the conclusion that, from the physical dimensions of the dugout, Kuz-

nia's position on top of Ford, and the trajectory of the bullet from Kuznia's pistol that killed Ford, it was at best unlikely and perhaps impossible for the second shot to have been fired by Ford. The Plaintiff's primary conclusion is that Kuznia shot Ford. It is not entirely clear whether her claim is that Kuznia shot Ford accidentally while both were struggling for Kuznia's pistol or whether, in her wording used at one point, the police "murdered" Ford. *See* Brief for Appellee at 26. Alternatively, the Plaintiff contends that, if Kuznia did not shoot Ford, the shooting was a suicide resulting from the officers' precipitous conduct in the dugout.

The parties agree that after the second shot was fired at approximately 1:30 A.M., Ford was taken to a hospital where he was pronounced dead. Officers Kuznia, Levanites, and Mullan remained at the scene until Lt. Mitchell arrived, at which time they went to the hospital where they were treated for various injuries.

*Lt. Moore.* During the entire altercation at the dugout, Lt. Moore remained at the police station. His only actions germane to the incident, prior to Ford's death, consisted of dispatching officers to the scene and listening on the police radio to whatever police communications were broadcast. Moore acknowledged at his deposition that as the shift supervisor that night, he could have radioed commands to the officers at any point. However, the radio transmissions from the field, according to undisputed portions of Moore's deposition, did not convey the "blow by blow" escalation of the incident.

Ten minutes after the shooting, Lt. Moore went to the recreational field, and then called Lt. Mitchell. Officers at the scene began taking pictures of the dugout, but formal evidence-gathering was delayed until Lt. Mitchell arrived approximately a half hour later. In conjunction with a superior officer, Lt. Moore decided that Kuznia and Mullan would not write individual reports of the episode. Instead, Lt. Moore prepared a report "to set forth the combined recollections of myself, Officer Kuznia, and Officer Mullan." Moore conceded that this was not the customary practice, but that it was done in this instance because Kuznia and Mullan were "very upset that morning." Levanites completed his own report. Upon the arrival of Lt. Mitchell, Lt. Moore turned the investigation over to Mitchell and then left to take Kuznia and Mullan to the hospital.

*Lt. Mitchell.* Lt. Mitchell had no involvement with the episode until he arrived at the scene around 2:10 A.M. Upon arriving, he was briefed on the incident by Lt. Moore, and then began collecting evidence and assigning officers for further investigation. Most of the relevant evidence was bagged and placed in a police car, but the officers' and the decedent's bloody clothes were not retained. The guns and the dugout were not examined for fingerprints.

The follow-up investigation was less thorough than what might have been expected had the officers been gathering evidence for a criminal prosecution. The tapes used to record the evening's radio transmissions concerning the incident were reused, precluding preservation of the officers' radioed conversations. Interviews with hospital personnel were not taken, and no internal affairs review was conducted.

## II. Proceedings in this case

Jacqueline Ford, individually and as the administratrix of Robert Ford's Estate, filed suit under 42 U.S.C. §§ 1981, 1983, and 1985(3) against the Saratoga Springs Police Department ("Police Department"), the City of Saratoga Springs ("City"), Lt. Mitchell, Lt. Moore, and several other police officers. Her complaint also contained tort and constitutional claims under New York law.

The suit alleges that the defendants used unreasonable and excessive force and then colluded to cover up their misconduct after the fact. The complaint also alleges

that the defendants exercised a substandard level of care in the intervention because Ford was African–American. Finally, the complaint claims that several of the defendants (but not Mitchell or Moore) failed to adequately train the police officers who entered the dugout.

The complaint accuses the officers of using unreasonable force in "killing" Ford, "or in the alternative . . . allowing him to kill himself." The complaint makes few specific factual allegations, instead broadly calling the defendants' conduct unreasonable and unconstitutional. Since filing the complaint, the Plaintiff has assembled a team of experts whose affidavits allege that Kuznia's actions in the dugout were reckless and unreasonable, that the investigation of the incident "fell far short of even minimally acceptable police procedures" and has frustrated current attempts to determine what happened in the dugout, that the police department's suicide training was "grossly deficient," and that it was "virtually impossible" for the defendant to have shot himself in the confined space of the dugout if the incident took place as the defendants described in their reports and depositions.

After the Plaintiff took numerous depositions and engaged in other discovery, all of the Defendants moved for summary judgment. Mitchell and Moore, along with most of the individual officers, argued that their actions were too remote (both physically and temporally) from the conduct at the field to support a finding that they were "personally involved" in any alleged misconduct, as required for liability under section 1983. They also argued, in the alternative, that they were entitled to qualified immunity from suit. The District Court dismissed all claims against the City and the Police Department. The Court also dismissed the complaint as to four officers who maintained positions "well

outside" the dugout, and whose involvement was therefore "too remote" from the alleged unconstitutional conduct for them to be personally liable. However, the Court permitted the claims against Mitchell, Moore, and four other defendants,[1] in their individual capacities, to proceed past the summary judgment stage.[2] In its ruling, the Court made no mention of these defendants' requests for qualified immunity.

Mitchell and Moore now seek interlocutory review of the denial of their qualified immunity defense.

### Discussion

#### I. Exercise of Appellate Jurisdiction

There is no doubt that we have appellate jurisdiction on this interlocutory appeal to consider the denial of the defense of qualified immunity to the extent that the defense turns on an issue of law, *see Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), even though the District Court did not explicitly consider the defense, *see Musso v. Hourigan*, 836 F.2d 736, 741 (2d Cir.1988). However, our precedents differ as to the appropriateness of exercising such jurisdiction in the absence of district court analysis of the issue. In some cases, we have sent the case back to the district court for consideration of the qualified immunity issue. *See Brown v. City of Oneonta*, 106 F.3d 1125, 1133–34 (2d Cir.1997); *Eng v. Coughlin*, 858 F.2d 889, 895 (2d Cir.1988); *Francis v. Coughlin*, 849 F.2d 778, 780 (2d Cir.1988); *Musso*, 836 F.2d at 741. In other instances, however, we have adjudicated the merits of the qualified immunity defense. *See X–Men Security, Inc. v. Pataki*, 196 F.3d 56, 66–67 (2d Cir.1999) (immunity defense not considered in district court because discovery not completed); *Dube v. State University of New York*, 900 F.2d 587, 596 (2d Cir.1990).

---

**1.** These defendants were Kuznia, Mullan, Levanites, and Kenneth King, the Chief of the Police Department. The Plaintiff has since dropped King as a defendant.

**2.** The court dismissed the claims as to these defendants in their official capacities.

Although a remand for initial district court consideration might be warranted in some cases, we think it appropriate to adjudicate the immunity defense at this time. The purpose of qualified immunity, where applicable, is to shield government officials from the distractions of drawn-out litigation. *See Mitchell,* 472 U.S. at 525, 105 S.Ct. 2806. This suit was filed more than four years ago, and Mitchell and Moore asserted their immunity defense in a summary judgment motion that awaited a ruling for fifteen months. After that ruling omitted consideration of the Appellants' immunity defense, we need not subject them to the delay of a remand to afford the District Court a second opportunity to adjudicate the defense where the resolution of the qualified immunity defense can be decided as a matter of law based on the undisputed facts in the record. *See In re Montgomery County,* 215 F.3d 367, 375 (3d Cir.2000) (adjudicating merits of qualified immunity claim, even though District Court ignored issue, where complaint was pending for four years and defendants had diligently pursued their immunity claim and their appeal). We caution, however, that our adjudication of the qualified immunity issue on appeal under the specific circumstances in this case should not be interpreted by future litigants and district judges as an invitation to modify the longstanding rule that district courts promptly adjudicate properly presented qualified immunity defenses in the first instance.

## II. Qualified Immunity

 A defendant official is entitled to qualified immunity if (1) the defendant's actions did not violate clearly established law, or (2) it was objectively reasonable for the defendant to believe that his actions did not violate such law. *See Salim v. Proulx,* 93 F.3d 86, 92 (2d Cir.1996). For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law. *See Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). An officer's actions are objectively reasonable if "officers of reasonable competence could disagree on the legality of the defendants' actions." *See Salim,* 93 F.3d at 91 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

### A. Lt. Moore

 We focus initially on the qualified immunity defense of Lt. Moore to the Plaintiff's claim under section 1983.[3] The Plaintiff's claim against Lt. Moore has two parts. First, the Plaintiff argues that Moore failed to adequately supervise by radio his subordinates at the scene of the shooting, thereby contributing to their allegedly unconstitutional conduct. Second, the Plaintiff claims that Moore participated in a cover-up conspiracy that violated the decedent's rights.

 *Supervision by radio.* In considering the supervision claim against Moore, we must distinguish between two aspects of Ford's claim against the subordinate officers at the scene. First, to whatever extent the Plaintiff is claiming that Kuznia shot Ford, no reasonable jury could possibly find that Moore was responsible for

---

**3.** To whatever extent the Plaintiff is asserting claims under sections 1981 and 1985(3), those claims fail, as to both Appellants, for lack of any evidence of the requisite discriminatory intent. *See Oliveri v. Thompson,* 803 F.2d 1265, 1280 (2d Cir.1986). On a motion for summary judgment asserting a qualified immunity defense, the Plaintiff has an obligation to offer "particularized evidence of direct or circumstantial facts" supporting a claim of unlawful intent. *See Blue v. Koren,* 72 F.3d 1075, 1083 (2d Cir.1995); *see also Crawford–El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (requiring plaintiff to come forward with "affirmative evidence" of unlawful intent, if it is necessary element of plaintiff's claim, to defeat motion for summary judgment based on qualified immunity).

what, in essence, would be a claim of homicide. The evidence that Kuznia shot Ford, tenuous at best, is confined to the opinions of the Plaintiff's experts that Ford could not have shot himself with Kuznia's pistol, if the incident happened as the officers reported. Even if that evidence were to support an inference of Kuznia's liability, and we do not suggest that it does, it totally fails to indicate that Moore, sitting at his desk at police headquarters, had any opportunity to intercede in the struggle in the dugout, during which, the Plaintiff claims, Kuznia fired his pistol. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988) (no rational juror could conclude that defendant had an opportunity to intercede when "blows were struck in rapid succession").

█ On the other hand, Moore has some peripheral involvement in the other aspect of Ford's claim—namely, that the officers on the scene violated Ford's rights by the nature of their response to his threatened suicide. More specifically, Ford's claim appears to be that the officers acted so precipitously as to increase the likelihood that Ford would shoot himself, or that they failed to take steps that would have minimized the risk of his suicide. As to the officers on the scene, this claim is not unlike those leveled at publicly employed social workers who are faulted by parents for removing an at-risk child too quickly from a dysfunctional home and faulted by children for failing to act until after abusive conduct has occurred. *See Doe v. Conn. Dep't of Child and Youth Services*, 911 F.2d 868 (2d Cir.1990); *van Emrik v. Chemung County*, 911 F.2d 863 (2d Cir.1990). It is not hard to imagine the claim Ford's mother would be making if the officers on the scene had delayed in removing the rifle from her son's grasp and he had succeeded with his initial plan to kill himself with the rifle.

However problematic might be the claim against the officers on the scene, the claim against Lt. Moore is plainly without merit. As to him, the issue is whether, in his supervisory capacity,[4] he could be found liable under section 1983 for any action or inaction of his that was causally related to Ford's death (assumed, for this aspect of the claim, to have been a suicide). The Plaintiff points to specific steps that she contends Moore should have taken to avert his subordinates' allegedly unconstitutional conduct. She claims that Moore should have ordered Kuznia out of the dugout because Kuznia had inadequate mental health training, should have ordered a psychiatrist or mental health specialist to the scene, and should have ordered a de-escalation after Ford's rifle had been taken

4. The application of qualified immunity law to supervisory liability claims presents important and unresolved questions. What law must be "clearly established" to defeat a qualified immunity defense: the law violated by the subordinates, or the supervisory liability doctrine under which the plaintiff hopes to hold the defendant liable, or both? And what must be "objectively unreasonable": the subordinates' acts, or the supervisor's failure to act, or both?

These questions have gone largely unexplored. The First Circuit, in a thoughtful opinion, recently appeared to conclude that a court should examine whether the constitutional right allegedly violated by the subordinates *and* the plaintiff's supervisory liability theory are clearly established, and if they are, then move on to evaluate the supervisor's objective reasonableness in failing to act. *See Camilo–Robles v. Hoyos*, 151 F.3d 1, 8 (1st Cir.1998). This Circuit has not explicitly discussed the issue, but has at least once used a rule different from the First Circuit's, looking to the clarity of the law allegedly violated by the subordinates, and then moving on to the objective reasonableness of the defendant's actions. *See Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.1991); *see also Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 128 (2d Cir.1997) (applying a similar rule in the analogous context of an officer's "failure to intervene" to prevent a colleague's unconstitutional acts).

Because we hold that Lt. Moore is entitled to qualified immunity under even the narrow rendering of the doctrine favorable to the Plaintiff (one in which only the law violated by the subordinates must be clearly established, and only the supervisor's acts must be objectively unreasonable), we leave this matter to be resolved another day.

away by Mullan. On the evidence presented, none of these arguments suffices to create a fact issue as to Moore's entitlement to qualified immunity.

Although the Plaintiff offers hundreds of pages of expert opinion attacking almost every facet of the conduct of the officers at the recreational field, only one expert is willing to question Moore's decision not to issue orders from the police station, and this expert does so only in passing, without identifying any specific steps he thinks Moore should have taken.[5] *See* Polio Supp. Report at 31. It is not surprising that the Plaintiff's otherwise highly critical experts have little to say about Moore's failure to direct his subordinates by radio: Moore testified at his deposition that the radio transmissions did not convey the "blow-by-blow" action at the field, and the Plaintiff offers no evidence contesting this credible claim. On the other hand, Moore dispatched an officer to the field, Sergeant John King, who had what one of the Plaintiff's own experts described as "useful[ ]" and "applicab[le]" mental health training.[6] It was objectively reasonable for Moore, who possessed necessarily limited information about the events at the field, to rely on the judgment of a subordinate trained in mental health issues who was at the scene, could see what was occurring, and could respond quickly to new developments. In fact, a strong argument could be made that it would have been objectively *unreasonable* for Moore to have issued directives from afar in a delicate, life-and-death situation, basing his orders solely on the incomplete information conveyed in scattered radio transmissions.

It is by no means clear that Moore could have done anything to prevent Ford's death, however it might have occurred. In any event, it was objectively reasonable, as a matter of law, for Moore to believe that all of his conduct in supervising the officers at the scene did not violate any of Ford's constitutional rights.

■ *Alleged cover-up.* The Plaintiff next contends that Moore participated in a conspiracy, after Ford's death, to cover up the officers' allegedly unconstitutional conduct at the field. The sole allegation against Moore as to this claim is that he ordered Kuznia and Mullan not to write individual reports of the episode, but instead to cooperate with Moore in preparing a joint report. Moore contends that he thought Kuznia and Mullan were upset by the night's events, a position consistent with the need to take those officers to the hospital. The Plaintiff implies, without any basis in the evidence, that Moore decided upon the joint report to assure consistency between the recollections of Kuznia and Mullan.

Whether or not any constitutional right is implicated by the preparation of a joint report when a supervisory officer has some reason to believe a crime has occurred, there is no clearly established constitutional law requiring the supervisor to make sure that police officers write individual reports of an incident that the supervisor reasonably believes does not involve a criminal investigation. Before arriving at the scene, Lt. Moore knew that Ford had written two suicide notes and been seen in the dugout, holding a rifle pointed at his head. When Moore arrived on the scene, he was told that Ford had succeeded in killing himself, apparently obtaining Kuz-

---

5. In fact, when the expert reports impugn Lt. Moore's decision to write a report together with Kuznia and Levanites, they do so precisely because Moore "had no direct personal knowledge of the incident." *See, e.g.,* John V. Polio, Supplemental Report on *Ford v. Saratoga Springs* ("Polio Supp. Report") at 35.

6. The Plaintiff's psychiatric expert, Dr. Thomas Qualtere, concedes that Sergeant King had

the "relevant" mental health training, and that the "usefulness" of the training and its "applicability to the Robert Ford incident cannot be disputed." *See* Affidavit of Thomas A. Qualtere, at 7, 9.

The Plaintiff's police expert also commended the training of another officer Moore dispatched to the scene, Sergeant Michael Welch. *See* Polio Supp. Report at 29.

nia's pistol during the struggle in the dugout. The evidence available to him reasonably indicated that Ford had committed suicide. The Plaintiff's theory that Kuznia killed Ford arises from the theories of experts who offered their opinions long after the episode occurred. To whatever extent the Plaintiff might have evidence that the officers present at the dugout participated in a cover-up, the only evidence proffered to show that Lt. Moore participated in such a cover-up is that he authorized preparation of a joint report. In view of the circumstances as he reasonably perceived them at the scene, that evidence is wholly insufficient to create a factual dispute as to whether Lt. Moore joined such a cover-up, if one existed, or failed to act in an objectively reasonable manner.

■ Even if there were a viable claim against Moore for conduct after Ford's death, the death would have extinguished any claim of Ford's, see *Judge v. City of Lowell,* 160 F.3d 67, 76 n. 15 (1st Cir.1998) ("[A]ll of the actions that form the basis of Judge's claims occurred subsequent to Weems's death. At that time, Weems had no rights of which he could be deprived."); *Silkwood v. Kerr–McGee Corp.,* 637 F.2d 743, 749 (10th Cir.1980) (holding that a decedent cannot state a Bivens claim for post-death conduct because "the civil rights of a person cannot be violated once that person has died"), and whatever post-death claim the Plaintiff might have in her capacity as administratrix, *see Barrett v. United States,* 689 F.2d 324, 332 (2d Cir. 1982) (protecting property right to be "fully compensated through a lawsuit"), has not been alleged.

### B. Lt. Mitchell

■ Lt. Mitchell, who had no connection with the episode until his arrival on the scene after Ford's death, can have no liability whatsoever for Ford's death. The Plaintiff's sole claim against Mitchell is that, like Moore, he participated in an alleged cover-up of the circumstances of Ford's death. Mitchell is faulted for failing to conduct an adequate investigation at the scene, an investigation that the Plaintiff speculates might have provided support for the later-constructed theory that Kuznia shot Ford. This claim is as deficient as the "cover-up" claim against Moore.

### Conclusion

The Plaintiff's claims against both Appellants are either legally deficient as pleadings, unsupported by evidence of a constitutional violation, or otherwise barred by the defense of qualified immunity. *See Salim,* 93 F.3d at 89–91 (outlining alternative bases for upholding qualified immunity defense). Since the federal claims fail at the outset, the pendent claims against these Appellants must also be dismissed. *See id.* at 92; *Lennon,* 66 F.3d at 426. Because Officers Kuznia, Mullan, and Levanites withdrew their appeals of the District Court's decision on summary judgment, we express no view as to whether they are entitled to qualified immunity defenses with respect to the claims against them. Accordingly, on remand, Defendants Kuznia, Mullan, and Levanites should be permitted to renew their motion for summary judgment on qualified immunity grounds. Should these Defendants do so, the District Court may decide the question of qualified immunity based on the parties' previous submissions on summary judgment, or request additional briefing from the parties in light of our decision.

We reverse and remand to the District Court with instructions to dismiss the complaint as to Lts. Moore and Mitchell.