Stephen **DERFINY**, Plaintiff–Appellee,

v.

**PONTIAC OSTEOPATHIC HOSPITAL, Donald Sheesley, Samuel N.F. Johnson and Brian D. Purchase, Defendants–Appellants.**

No. 02–2308.

United States Court of Appeals, Sixth Circuit.

July 6, 2004.

930

Justin C. Ravitz, Patrick J. Burkett, Patricia A. Stamler, Sommers, Schwartz, Silver & Schwartz, Southfield, MI, for Plaintiff–Appellee.

Cynthia E. Merry, Michael T. Ryan, Merry, Farnen, St. Clair Shores, MI, for Defendants–Appellants.

Before SUHRHEINRICH and CLAY, Circuit Judges; and GWIN, District Judge.*

CLAY, Circuit Judge.

Defendants, Pontiac Osteopathic Hospital ("POH"), Doctors Donald Sheesley, Samuel Johnson, and Brian Purchase, appeal from the district court's order entered on October 17, 2002, denying Defendants' motion for summary judgment based on qualified immunity with regard to Plaintiff Stephen Derfiny's claim of an Eighth Amendment violation of his right to be free from cruel and unusual punishment, pursuant to 42 U.S.C. § 1983. Because we believe this case is not properly before this Court, we will REMAND back to the district court for further proceedings consistent with this opinion.

I.

BACKGROUND

*Procedural History*

Plaintiff, Stephen Derfiny, filed this civil rights action on November 2, 1999, while incarcerated in the Oakland County jail, claiming Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment, pursuant to 42 U.S.C. § 1983.[1] Defendants filed two motions for summary judgment: (1) requesting relief based on a lack of proximate cause for Plaintiff's alleged constitutional violation; and (2) requesting relief based on an insufficient showing of deliberate indifference, as required for a § 1983 claim and an entitlement to qualified immunity.[2]

* The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

1. Plaintiff originally brought suit against Oakland County; Oakland County Board of Commissioners; Michael Bouchard, Sheriff of Oakland County; Thomas Quisenberry, the Under Sheriff of Oakland County; Donald Sheesley, D.O.; Samuel N.F. Johnson, D.O.; Katherine J. Alizo, D.O.; Carolyn W. Bird, M.D.; Sam R. Kaidi, D.O.; Teresa Gardner,

D.O.; Roy S. Hembey, D.O.; and Brian D. Purchase, D.O. The immediate appeal, however, solely addresses Defendants' motion for summary judgment based on qualified immunity, as it pertains to Defendants Sheesley, Johnson and Purchase, as employees of POH contracted out to the Oakland County jail.

2. The record on appeal is deficient in that neither of Defendants' motions for summary judgment, and the briefs in support of the

The district court granted in part and denied in part Defendants' summary judgment motion for lack of proximate cause on September 23, 2002. The court granted Defendants' summary judgment motion regarding proximate cause as it pertained to all claims alleged against Defendants subsequent to early October 1997[3] because these claims were deemed irrelevant to Plaintiff's injuries. The court denied Defendants' summary judgment motion regarding proximate cause as it pertained to all claims alleged against Defendants prior to early October 1997. The district court also denied Defendants' summary judgment motion regarding Plaintiff's "deliberate indifference" allegation under § 1983 as it pertained to Defendants POH, Sheesley, Alizo, Johnson, Gardner and Purchase.[4]

On October 17, 2002, the district court issued an amended order, setting forth the same disposition as the original September 1997 order, except for the court's acknowledgment of Defendants' qualified immunity claim as stated in their summary judgment motion, denying such immunity. The district court, having heard oral arguments on both of Defendants' motions for summary judgment, issued its order based upon the "reasons set forth in the record and otherwise by stipulation." *Id.* However-

er, the court's discussion on the record during oral argument merely addressed Defendants' claim of insufficient proximate cause and deliberate indifference.[5] On October 23, 2002, Defendants filed this interlocutory appeal based on the denial of qualified immunity.

### Facts

Plaintiff, a type I diabetic, was incarcerated in the Oakland County jail from May 1, 1997 through March 1998, on a probation violation for receiving and concealing stolen property. Upon entering the Oakland County jail, Plaintiff was able to read, write and had full function of his eyes. Plaintiff has been previously diagnosed as a "brittle" type I diabetic[6] by his prior doctor, and was previously diagnosed with mild diabetic retinopathy[7] by an opthalmologist in 1993. In speaking with various doctors over the years, Plaintiff had been told that the recommended treatment for his "brittle" type I diabetes consists of daily monitoring of his blood sugar levels and the adjustments of his insulin accordingly; consulting with a doctor once a month; and having an eye examination by an opthalmologist at least once a year. Consequently, prior to Plaintiff's incarceration he used a glucometer to check his

---

motions, are included in the Joint Appendix; they were independently obtained by this Court from the district court for our review.

3. This date represents when Defendants actively sought to measure Plaintiff's blood-sugar level after not doing so for approximately five months.

4. Defendants Alizo and Garnder are not parties to this appeal.

5. The district court did not engage in any discussion as to Defendants' qualified immunity claim during its hearing on Defendants' motions for summary judgment on August 21, 2002.

6. As a type I diabetic, Plaintiff is unable to produce insulin to control the level of sugar in his blood; therefore, he is dependent on daily insulin injections to control his blood sugar levels.

7. When a diabetic's blood sugar level escalates above a normal level, anything in excess of a level of 120, a condition known as hyperglycemia develops. This condition is not immediately symptomatic, but is instead associated with long term detrimental effects, such as retinopathy. Retinopathy, at its most progressed stage, will result in retinal detachment and other complications, causing blindness.

blood sugar once or twice daily. Once incarcerated. Plaintiff's glucometer was confiscated by an official at the Oakland County jail.

Upon Plaintiff's incarceration, a clinic physician and medical resident at POH, Dr. Kaidi,[8] performed an exam in the Oakland County jail clinic, with the assistance of two nurses. POH was contracted by Oakland County to provide medical services to the jail "in accordance with the standards of the community, National Commission of Correctional Health Care ("NCCHC"), and the policies and procedures of the Jail Health Program."

Before Plaintiff arrived at the Oakland County jail, records were prepared regarding Plaintiff's stay stating that he was a diabetic requiring two insulin shots daily. Upon Plaintiff's arrival at the jail, the initial examining doctor wrote Plaintiff a treatment plan for the maintenance of his diabetes. Plaintiff was placed on a 2400 caloric diet and prescribed two insulin shots per day. Although Plaintiff received his insulin shots daily, during Plaintiff's ten month incarceration his blood sugar was tested no more than ten times. The last recorded blood sugar reading, before the testing resumed in November of 1997, was May 8, 1997—the week Plaintiff was incarcerated.

Defendant Sheesley reviewed Plaintiff's chart on May 7 and May 8, 1997, but never actually saw Plaintiff. Plaintiff's blood sugar levels on those days were 285 and 261, respectively. Sheesley countersigned the note on Plaintiff's chart by the examining physician, feeling no need for additional testing.

Sometime in October of 1997, Plaintiff filled out a request for medical assistance pertaining to a finger injury, which was honored on October 29, 1997. Plaintiff had not seen a doctor since his first examination in May of 1997. Defendants Johnson and Purchase both countersigned three or four medication log sheets documenting the administration of Plaintiff's insulin injections throughout Plaintiff's incarceration; however, neither of those Defendants saw Plaintiff prior to countersigning his chart. Plaintiff visited the clinic again on November 25, 1997, where he received an eye examination, and again on November 26, 1997, where his blood was drawn. On both days Plaintiff's blood levels were above normal; 304 and 350 respectively. Plaintiff's blood was sent to a lab for an A1C test, which assesses the average daily blood sugar level over a three-month period, and the risk of retinopathy. The A1C test results showed that Plaintiff's average blood sugar level over the last three months was 331.

On December 5, 1997. Plaintiff asked to see an optometrist, and on December 8, 1997, complained of blurred vision. Plaintiff complained of vision problems again on December 10 and 13, 1997. On December 19, 1997, a POH physician referred Plaintiff to an opthalmologist. Dr. Gossage, whom Plaintiff saw three days later on December 22, 1997. Dr. Gossage diagnosed Plaintiff with proliferative diabetic retinopathy, and referred Plaintiff to Dr. Tarek Hassan, who examined Plaintiff on January 6, 1998. Dr. Hassan made the same diagnosis and performed vitreous surgery on Plaintiff's eyes in late January and February of 1998. Plaintiff's vision, however, continued to worsen, and he is now legally blind due to diabetic retinopathy. Plaintiff then brought these claims.

## II.

## DISCUSSION

*Standard of Review*

As a purely legal determination, the district court's denial of qualified immunity in

---

8.  Dr. Kaidi is not a party to this lawsuit.

connection with a summary judgment motion is subject to *de novo* review on an interlocutory appeal. *Thomas v. Cohen,* 304 F.3d 563, 568 (6th Cir.2002). For an interlocutory appeal to proceed, "a defendant seeking qualified immunity must be willing to concede to the facts as alleged by the plaintiff and discuss only the legal issues raised by the case." *Scicluna v. Wells,* 345 F.3d 441, 444 (6th Cir.2003) (quoting *Shehee v. Luttrell,* 199 F.3d 295, 299 (6th Cir.1999)). A moving party is entitled to summary judgment as a matter of law when there are no genuine issues of material fact. Fed.R.Civ.P. 56(c); *see also United Nat'l Ins. Co. v. SST Fitness Corp.,* 182 F.3d 447, 449 (6th Cir.1999). When deciding if summary judgment is proper, we must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### Analysis

Defendants pursue this interlocutory appeal for review of the denial of their motion for summary judgment based upon their alleged entitlement to qualified immunity because they were contracted by a state facility to perform medical service, and due to Plaintiff's alleged failure to establish a *prima facie* § 1983 claim. This Court questions Defendants' right to pursue an interlocutory appeal for the following reasons.

### A. Right to an Interlocutory Appeal

Generally, appellate courts have jurisdiction to review the final decisions of district courts. *See* 28 U.S.C. § 1291. However, under the collateral order doctrine, an order issued before the conclusion of a district court's proceedings under appropriate circumstances may be considered a final order and, therefore, immediately appeal-able. *Crockett v. Cumberland College,* 316 F.3d 571, 577–78 (6th Cir.2003) (citing *Johnson v. Jones,* 515 U.S. 304, 309, 115 S.Ct. 2151, 132 L.Ed.2d 238(1995)); *see* 28 U.S.C. § 1292. Under this doctrine, the legal determination regarding the appropriateness of a party's receipt of qualified immunity may be appealable on interlocutory review. *Id.* (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526–28, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)); *see also Behrens v. Pelletier,* 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). In cases where a denial of summary judgment based on the appropriateness of qualified immunity is predicated upon the district court's determination that a genuine issue of material fact exists, the decision will not be immediately appealable. *Johnson,* 515 U.S. at 313, 115 S.Ct. 2151; *see also Farm Labor Org. Comm. v. Ohio State Highway Patrol,* 308 F.3d 523, 536–37 (6th Cir. 2002); *Turner v. Scott,* 119 F.3d 425, 427 (6th Cir.1997).

Here, the district court held oral arguments on both of Defendants' motions for summary judgment, which challenged the proximate cause of Plaintiff's § 1983 claim, and the deliberate indifference element of the § 1983 claim; however, Defendants requested qualified immunity in conjunction with their opposition to Plaintiff's deliberate indifference allegation. The district court analyzed the § 1983 claim and its allegation of an Eighth Amendment violation, and found that several of the Defendants did exhibit deliberate indifference as to Plaintiff's medical needs. Nevertheless, there was no mention of qualified immunity during oral arguments before the district court. Not only did Plaintiff fail to oppose Defendants' request for qualified immunity during oral argument, but he also failed to address any opposition to qualified immunity before the district court. Thus, with the district court's order relying on reasons set forth in the

record, the court issued an order denying Defendants' qualified immunity with no accompanying legal or factual analysis.

Resolution of qualified immunity is purely a question of law for the district court. *Poe v. Haydon*, 853 F.2d 418, 424 (6th Cir.1988) (citing *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir.1987)). Trial courts should resolve questions of qualified immunity in the earliest possible stage of litigation because qualified immunity is immunity from suit "rather than a mere defense to liability," and "it is effectively lost if the case is erroneously permitted to go to trial." *Mitchell*, 472 U.S. at 526, 105 S.Ct. 2806. Nevertheless, the district court failed to address the issue of qualified immunity prior to its ruling. In fact, the reasons stated in the record upon which the district court ruled were Defendants' failure to examine Plaintiff for a five month period, and their deliberate indifference, which subsequently was the proximate cause of Plaintiff's injuries. Therefore, absent a discussion and analysis of qualified immunity, in addition to the inclusion of disputed factual issues that gave rise to the denial of Defendants' summary judgment, this matter is not properly before this court for a strictly legal review of the district court's qualified immunity determination on an interlocutory appeal. *Johnson*, 515 U.S. at 313, 115 S.Ct. 2151 (holding the district court's disposition, stating that the summary judgment record raised genuine issues of fact concerning the merits of respondent's claim, was not a "final decision" within the meaning of 28 U.S.C. § 1291). For these reasons, this Court will remand the matter back to the district court to determine Defendants' request for qualified immunity as a matter of law.

## B. Merits of Defendants' Qualified Immunity Claim

Based on the record currently before the Court, Defendants were correctly denied summary judgment given the genuine issues of material fact that exist regarding Defendants' alleged deliberate indifference.

Qualified immunity shields from liability for civil damages those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scicluna*, 345 F.3d at 445 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In analyzing qualified immunity claims, we employ a sequential analysis prescribed by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, plaintiffs must show that defendants deprived them of a right protected by the Constitution. *Thomas*, 304 F.3d at 569. Second, this right must be so clearly established that a reasonable officer would understand that his or her actions would violate that right. *Id.; see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (stating that on a motion for summary judgment under qualified immunity, the district court must determine whether the breadth of the right that the government official allegedly violated was "sufficiently clear that a reasonable official would have understood that what he is doing violates that right"). Since this inquiry will turn on the circumstances with which the official is confronted, and often on the information that he possesses, the district court must consider all of the undisputed evidence produced as a result of discovery, read in the light most favorable to the nonmoving party. *Green v. Carlson*, 826 F.2d 647, 650–52 (7th Cir.1987).

Although the district court did not engage in a qualified immunity analysis, it did discuss whether or not Defendants act-

ed with "deliberate indifference," which in this instance would be the indicator of the constitutional violation upon which qualified immunity is based. The constitutional violation Plaintiff alleges is a right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. This Court has held that the legal standard applied when analyzing an Eight Amendment claim regarding medical care for prisoners is "deliberate indifference." *Terrance v. Northville Regional Psychiatric Hospital,* 286 F.3d 834, 843 (6th Cir.2002) (citing *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999)) (en banc). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eight Amendment." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal citation omitted). A prison official can only be found liable for denying a prisoner humane conditions if that official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This is what the Court terms the objective and subjective components of an Eighth Amendment violation.

In the instant case, the district court considered liability with respect to any doctor who signed off on the continuation of Plaintiff's standard insulin prescription, without assessing Plaintiff's condition, or more importantly, his specific blood sugar level. Under the objective component of the deliberate indifference standard, the seriousness of Plaintiff's ailment was recognized on several occasions. As a type I diabetic, Plaintiff's condition was well known and properly documented in his file. The doctors in the facility placed him on two shots of insulin per day. Furthermore, Plaintiff possessed and used a glucometer which read his blood sugar levels on a daily basis, prior to incarceration, because of his history of erratic blood sugar levels; again, that information is located in Plaintiff's file. Therefore, any doctor treating Plaintiff in any capacity should have known of the excessive health risks to which Plaintiff was susceptible. *Terrance,* 286 F.3d at 846. Furthermore, Defendants' prescription of two insulin shots per day for over five months for Plaintiff illustrates Defendants' knowledge that Plaintiff had always been in serious need of medical services.

Under the subjective component of Plaintiff's alleged Eighth Amendment violation. Plaintiff must establish that Defendants had subjective knowledge of the serious health risks of Plaintiff's sporadic blood sugar level readings, which left no basis to accurately administer the correct level of insulin to control Plaintiff's diabetes; but simply disregarded such concerns. Although this burden falls on Plaintiff, the Supreme Court has warned courts that a prison official may "not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk he strongly suspected to exist." *Farmer,* 511 U.S. at 843 n. 8, 114 S.Ct. 1970. Furthermore, "[w]hether a prison official has the requisite knowledge of a substantial risk is a question of facts subject to demonstration in the usual ways, including inferences from circumstantial evidence." *Id.* at 842, 114 S.Ct. 1970.

1. Defendants Doctors Johnson and Purchase

Plaintiff has set forth facts that establish Defendants Johnson and Purchase,

who both countersigned three or four medication log sheets documenting the administration of Plaintiff's insulin injections months after his initial examination, had subjective knowledge of Plaintiff's potential for serious harm. By signing Plaintiff's chart, Defendants Johnson and Purchase had access to Plaintiff's accompanying medical history of erratic blood sugar levels, as well a history, or lack thereof, of tests performed on Plaintiff while incarcerated. Despite Defendants' knowledge of the available information, by administering drugs to a patient without assessing his need, Defendants Johnson and Purchase acted with deliberate indifference to Plaintiff's substantial risks. *Terrance*, 286 F.3d at 845 (holding doctor was not entitled to qualified immunity where doctor repeatedly administered drugs to patient without properly assessing his needs, exhibiting grossly inadequate care and placing patient at risk for substantial harm). This Court has held that liability may attach when it has been shown that Defendants acted or failed to act despite their knowledge of a substantial risk of serious harm. *Id.* at 843, 114 S.Ct. 1970.

### 2. Defendant Dr. Sheesley

There is a factual dispute, however, as to the information Defendant Sheesley possessed, inasmuch as he countersigned Plaintiff's chart on two separate occasions, May 7 and May 8, 1992, where Plaintiff's blood sugar readings were indicated. However, such an absence of documentation with respect to Plaintiff's medical treatment subsequent to May 8, 1992, should not absolve Sheesley of liability. Again, an official may "not escape liability

if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970. Consequently, Defendants have not established an absence of genuine issues of fact, as to the individual Defendants of Plaintiff's § 1983 claim; therefore, such factual issued should be reserved for a jury. *Id.*

Moreover, here the district court did not specify as to which Defendants the constitutional violation applied; [9] therefore, it is difficult to review its qualified immunity decision. Generally, "district courts should set out the reasons for their decisions with some specificity." *United States v. Woods*, 885 F.2d 352, 354 (6th Cir.1989) (noting that "[w]hen a motion for summary judgment is granted,[ ] without any indication as to the specific facts and rules of law supporting the court's decision, it is difficult, except in the simplest of cases, for an appellate court to review such a decision."); *see also Bybee v. Paducah*, 22 Fed.Appx. 387 (6th Cir.2001) (unpublished decision) (concluding that "the district court's order must be vacated. The district court's order is insufficient because it does not provide any indication as to the court's rationale for dismissing [plaintiff's § 1983] complaint.... Thus, a remand is necessary because the district court's order does not provide an adequate basis for appellate review"). Given the district court's lack of analysis, and, mere acknowledgment of Defendants' qualified immunity claim on the record during oral arguments, a remand would be more than appropriate.

---

**9.** The district court asserted that "deliberate indifference" would apply to every doctor who signed off on Plaintiff's chart confirming the administration of his insulin, which would then be determined by the parties; however, there are factual questions as to which doctors had the subjective knowledge with regard to Plaintiff's health risks, to have their conduct defined as deliberate indifference.

Furthermore, since there was no oral argument or judicial analysis regarding qualified immunity prior to this appeal, Plaintiff attempts to argue that the Defendants do not even facially qualify for qualified immunity since they were private physicians employed by a private hospital contracted by the County to provide medical services at the County jail. As discussed above, since qualified immunity is reserved for state actors, private litigants are generally not eligible to receive qualified immunity pursuant to § 1983. *Wyatt v. Cole,* 504 U.S. 158, 168–69, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). The Court has previously held, however, that a private litigant, who performed service at the "behest of the sovereign," is entitled to receive qualified immunity from suit. *Cullinan v. Abramson,* 128 F.3d 301, 310 (6th Cir.1997) (citing *Richardson v. McKnight,* 521 U.S. 399, 407, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)) (claiming that "the common law 'did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign.'") (citations omitted). We addressed this issue again in *Cooper v. Parish,* and ruled that particular plaintiff was not working at the behest of the sovereign, or performing any unique government function; therefore, qualified immunity was not applicable. 203 F.3d 937, 953 (6th Cir.2000). As Defendant responds, this issue was neither briefed nor argued in the lower court; thus, this is yet another reason for this Court to remand.

### III.

### CONCLUSION

This interlocutory appeal is limited to the review of the district court's denial of Defendants' request for qualified immunity. Since the district court did not set forth any findings of facts or conclusions of law explaining its decision we cannot adequately review Defendants' appeal. This case is not representative of the relatively simple cases we have previously held can be reviewed from an incomplete and insufficient record. *Woods,* 885 F.2d at 354. The deficiency of the record and brevity of the district court's order preclude this Court from engaging in a proper review; therefore, we REMAND this case to the district court for further proceedings consistent with this opinion. Additionally, given the various relationships and interactions with the Plaintiff in this case. we strongly suggest Defendants seek individual representation.

SUHRHEINRICH, Judge.

I agree that we have jurisdiction under the collateral order doctrine to review the district court's denial of Defendants' motion for qualified immunity. I agree too that the matter should be remanded back to the district court to determine Defendants' request for qualified immunity as a matter of law, but I would further direct the district court to make an individualized assessment as to each Defendant, based on Plaintiff's version of the facts.

However, I do not concur in Section B, because I think that we do not have jurisdiction at this juncture to conduct to hold that the district court "correctly denied summary judgment given the genuine issues of material fact that exist regarding Defendants' alleged deliberate indifference." Again, I would simply direct the district court, on remand, to initially conduct an individualized qualified immunity analysis for each Defendant, and, then, assuming that the district court denies qualified immunity to any of the Defendants, to then conduct a distinct, individualized deliberate indifference analysis under the summary judgment standards for each Defendant. Lastly, as the majority

instructs. I think that the district court should urge Defendants to seek individual representation.

GWIN, District Judge, dissenting.

GWIN, Judge.

Disagreeing with the majority's disposition of this case, I dissent. Because I conclude that we do not have jurisdiction over the interlocutory appeal brought by these private party state actors. I would DISMISS the appeal. Alternatively, if these private party actors were found eligible to raise the qualified immunity defense, I would AFFIRM the district court's denial of summary judgment on qualified immunity grounds.

## I. JURISDICTION OVER APPEAL

Doctors Sheesley, Johnson, and Purchase bring this interlocutory appeal based on the district court's order denying them summary judgment on qualified immunity grounds. Before entertaining this appeal, we must preliminarily decide if these private party actors have the right to assert a qualified immunity defense. If they are not eligible to assert the defense, we lack jurisdiction over their interlocutory appeal and must dismiss it.

Differing from the majority. I find that the record before us is sufficient to make this determination and therefore would not remand for further development of the record. Further, despite the fact that this issue was not raised in the district court, I believe that we may, in fact must, address this issue since it concerns our jurisdiction over this appeal.[1]

In *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), the Supreme Court examined the history and purposes of qualified immunity and determined that private prison guards had no right to assert the defense. In reaching this conclusion, the Supreme Court considered whether there existed a "firmly rooted" tradition of immunity for privately employed prison guards and whether the purposes of qualified immunity justified its extension to such private actors. *Id.* at 404–06, 117 S.Ct. 2100.

Since *Richardson,* a number of circuits and district courts have directly addressed the right of private medical providers working as independent contractors for government entities to assert the qualified immunity defense. In situations similar to that *sub judice,* courts have consistently held that private medical providers may not assert the qualified immunity defense. *See Jensen v. Lane County,* 222 F.3d 570, 578 (9th Cir.2000) (finding no qualified immunity defense available for private physicians providing services to county relating to civil commitments); *Hinson v. Edmond,* 192 F.3d 1342, 1345 (11th Cir.1999), *amended on other grounds,* 205 F.3d 1264 (2000) (finding private physicians providing medical services to prison inmates had no right to assert qualified immunity defense); *Halvorsen v. Baird,* 146 F.3d 680, 685–86 (9th Cir.1998) (determining private

---

1. The majority opinion contends that we should not review this issue since it was raised for the first time in a reply brief. *See, e.g., Overstreet v. Lexington–Fayette Urban Co. Gov't,* 305 F.3d 566, 578 (6th Cir.2002). However, this is a matter that could have been raised *sua sponte* by the Court since it concerns our jurisdiction. Additionally, since the joint appendix contains a copy of the contract between Oakland County and the

Pontiac Osteopathic Hospital, I believe that we have all the information necessary to make a determination on this issue. *See Hinson v. Edmond,* 192 F.3d 1342, 1344 n2 (11th Cir.1999) (concluding that the appellate court had sufficient record before it to make determination based on fact that parties supplemented the record with copy of contract and supplemental briefs).

employees providing city with involuntary commitment services for inebriates had no right to assert qualified immunity defense); *McDuffie v. Hopper*, 982 F.Supp. 817, 825 (M.D.Ala.1997) (finding private physicians providing medical services to inmates had no right to qualified immunity defense): *Nelson v. Prison Health Services*, 991 F.Supp. 1452, 1461–62 (M.D.Fla. 1997) (deciding that private nurses providing medical services to prisoners were not entitled to raise qualified immunity defense).

Of these post-*Richardson* cases, the Eleventh Circuit case of *Hinson v. Edmond* is especially relevant. In *Hinson*, the Eleventh Circuit held that "[f]or the same reasons that the *Richardson* Court declined to extend the doctrine of qualified immunity to privately employed prison guards, we decline to extend qualified immunity to this privately employed prison physician." 192 F.3d at 1345. The *Hinson* court explained, no "firmly rooted" tradition of immunity existed at common law for prison physicians working as independent contractors. 192 F.3d at 1345–46.[2] Moreover, the *Hinson* court found compelling the fact that the medical services agency providing doctors to the prison had sole responsibility for matters relating to medical judgment at the prison. *Id.* at 1346.

Similar reasons support a conclusion that the doctors in this case cannot assert a qualified immunity defense. The contract between Oakland County and Pontiac Osteopathic Hospital provides that the private physicians from the Hospital working in the Jail were not employees of the County but independent contractors. J.A. 66. As in *Richardson*, the Hospital performed its task of providing inmate medical services for profit. The Hospital, not the County, was responsible for recruiting, hiring, and supervising the physicians that provided medical services for inmates. In fact, the County provided no significant oversight on the care provided by the Doctors beyond quarterly meetings between the Hospital staff and County staff. J.A. 65.

Courts must narrowly interpret the right to an interlocutory appeal based on a denial of qualified immunity recognized in *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). As an aberration from the final judgment rule, interlocutory appeals from denial of immunity defenses have the potential both of burdening appellate courts and disrupting proceedings in district courts. Moreover, such appeals may have the effect of delaying justice. *See Mitchell*, 472 U.S. at 556, 105 S.Ct. 2806 (Brennan.J., dissenting).

Keeping in mind that these interlocutory appeals diverge from the final judgment rule. I do not believe that they are generally justifiable for private party defendants. In allowing an interlocutory appeal in *Mitchell*, the Supreme Court focused on concerns relating to interference with official governmental functions. In dealing with a suit against the Attorney General, the Court emphasized the importance of not subjecting government officials either

---

2.

And although the Supreme Court, in passing, mentioned that 'apparently, [in England], the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at the behest of the sovereign,' the circumstances here do not seem to be the kind of situation encompassed by that statement.

The sources cited by the Court suggest that, under certain circumstances, English doctors and lawyers were immune from liability for acts amounting to negligence. For acts amounting to recklessness or intentional wrongdoing, as are alleged here, immunity did not exist, however.
*Hinson*, 192 F.3d at 1345–46 (internal citations omitted).

to the costs of an unnecessary trial or to the burdens of broad-reaching, unwarranted discovery. *Id.* at 526, 105 S.Ct. 2806 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Supreme Court further emphasized that allowing interlocutory appeals for those performing government functions served societal purposes. The Court reasoned that without interlocutory appeals, the public would bear the financial cost for unnecessary trials, suffer the distraction of officials from pressing public concerns, and experience the deterrence of able citizens from accepting public office. *Id.*

These concerns are not present in this case involving private party defendants. *See, e.g., Lovell v. One Bancorp,* 878 F.2d 10, 13 (1st Cir.1989) (concluding that a private party defendant did not have the right to an interlocutory appeal from a denial of qualified immunity); *Chicago v. N. Transp. Co. v. Uley,* 787 F.2d 1239, 140–41 (8th Cir.1986) (same). Allowing the appeal provides no savings to the public since the Doctors are not public employees involved in pressing public concerns. Instead they are private employees of a for-profit entity.

Because I conclude that the Doctors, due to their status as privately employed prison physicians, are ineligible to advance the defense of qualified immunity and because I conclude that these privately employed defendants do not have a right to

an interlocutory appeal under *Forsythe.* I would dismiss the appeal.

## II. REVIEW OF DENIAL OF QUALIFIED IMMUNITY

Alternatively, if it were determined that the Doctors have the right to assert a qualified immunity defense and bring an interlocutory appeal, I would affirm the district court.[3] Although sympathetic to the majority's frustration with the district court's failure to provide analysis and reasoning for its denial, I find no reason and certainly no requirement that we remand.[4] In reviewing a denial of qualified immunity, appellate courts conduct *de novo* review. *Comstock,* 273 F.3d at 701. Therefore, we accord no deference to the legal analysis the district court used in reaching its decision to deny the Doctors qualified immunity. Additionally, to bring the interlocutory appeal, the Doctors have had to concede all facts in the Derfiny's favor. Thus, it is irrelevant what facts the district court relied on. Further, case law makes clear that an appellate court can consider the denial of the defense of qualified immunity, to the extent the defense turns on an issue of law, regardless of whether or not the district court fully analyzed, or even explicitly considered, the defense. *See, e.g., Ford v. Moore,* 237 F.3d 156, 161–62 (2d Cir.2001) (adjudicating merits of qualified immunity claim, even though district court did not explicitly address the

**3.** Additionally, I would dismiss the Doctors' appeal regarding the proximate cause of Derfiny's injury. Although Doctors state they are willing to concede any disputed facts for the purpose of appeal, they fail to do so in their proximate cause argument. Thus, we lack jurisdiction over this part of the appeal. *See Johnson v. Jones,* 515 U.S. 304, 319–20, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

**4.** In any case, I am puzzled by the majority's disposition to remand the case. In its introductory paragraph, the majority states that it

is remanding because it does not believe the case is properly before it. Such a conclusion suggests that the majority should dismiss the appeal. That this is the proper resolution of the case is further supported by language on page 9 of the opinion where the majority suggests that material issues of fact exist. This language suggests that the proper disposition of the case should be dismissal for lack of jurisdiction, not remand. *See Johnson,* 515 U.S. at 319–20, 115 S.Ct. 2151.

defense so as to prevent further delay for action filed more than four years earlier); *In re Montgomery County*, 215 F.3d 367, 373 (3d Cir.2000) (same). Derfiny filed his complaint in 1999, more than four years ago. I find no reason to subject the parties to further delay where the resolution of the qualified immunity defense can be decided as a matter of law based on the conceded facts.

Considering the merits of the Doctors' qualified immunity defense, I find that the record clearly supports the district court's denial of summary judgment based on qualified immunity. Taking the facts in the light most favorable to Derfiny. I conclude that Derfiny has set forth facts from which a reasonable jury could conclude that the Doctors were deliberately indifferent by disregarding their knowledge of Derfiny's high blood glucose levels.

During Derfiny's intake interview at the Oakland Jail, he advised that as a brittle diabetic, he required insulin and daily blood sugar level checks to appropriately adjust his intake level. J.A. 366–67. Derfiny further explained upon intake that he managed his insulin on a sliding scale, based upon his daily blood level checks. Since the Jail confiscated Derfiny's personal blood testing machine, he was dependent upon the Jail to check his blood levels.

Normal blood glucose levels run between 70–110. On May 7, 1997, Derfiny's blood glucose was checked and recorded as being elevated at 285. J.A. 133. On May 8, 1997, his blood glucose remained significantly elevated at 261. J.A. 134. After this check on May 8, Derfiny's blood glucose level was not checked until six months later in November 1997. Blood testing done at that time indicated that Derfiny's blood sugar for the prior three months had averaged 331.

With diabetes, patients need to adjust insulin administration to keep blood glucose levels near normal. The insulin needed to achieve this differs for each patient, and for each patient differs at over the course of the day. Derfiny did receive insulin shots twice daily during this six-month period. Throughout this six-month period, Doctors Johnson and Purchase signed off on the quantity of insulin given though they knew that the quantity had been grossly insufficient during testing on May 7, 1997, and May 8, 1997. Despite knowledge that the quantity of insulin given was insufficient, the physician defendants appear to have done nothing to adjust the dosage. And they gave Derfiny no blood glucose level checks. Yet by signing Derfiny's chart, Defendants Johnson and Purchase had access to Derfiny's medical history and knew that he was a brittle diabetic requiring regular blood glucose checks and accompanying adjustments to his insulin dosage.

Expert deposition testimony showed that recommended treatment for Derfiny's diabetes includes frequent monitoring for blood glucose levels throughout the day and the adjustment of insulin according. J.A. 396. As trained medical professionals, Doctors Johnson and Purchase were aware of the standard treatment for diabetes and the effects of both low and high blood sugars. J.A. 391, 405–06. Such risks included the very injury Plaintiff eventually suffered, diabetic retinopathy. Moreover, Derfiny had alerted the Jail to the instability of his blood sugar levels and the need for monitoring of such levels throughout the day.

Just as disturbing, if not more so, is the fact that Defendant Doctor Sheesley was aware that Derfiny had elevated blood levels on both May 7 and May 8 but did nothing to adjust his insulin to remedy this problem. Doctor Sheesley's signature on

Derfiny's charts on both dates shows that he knew Derfiny's blood glucose level was elevated. Yet, Doctor Sheesley made no changes to the insulin dose. Rather, jail staff continued to give Derfiny the dose he had been taking upon admission to the jail. Expert testimony showed that recommended treatment required adjustment of the insulin for Derfiny, a known brittle diabetic. In fact, such testimony indicated that Derfiny's blood sugar level should be between 80 and 120. Doctor Sheesley's decision not to make any change in the insulin dose following two days of extremely high levels suggests deliberate indifference to Derfiny's potential for harm.

The doctors contend that they could not have been deliberately indifferent since Derfiny never complained of eye problems or any other symptoms. However, high blood sugar levels do not cause immediate symptoms but problems over time. Through their medical education, the doctors had knowledge of this fact. In sum, Derfiny's evidence establishes facts from which it could be concluded that Plaintiff, as a brittle diabetic, was at substantial risk of harm from the doctors' failure to monitor his blood glucose level. Moreover, when viewed in the light most favorable to Derfiny, the aforementioned facts would allow a conclusion that the doctors knew that Derfiny faced a substantial risk of harm from their failure to monitor his blood sugar levels. *See Rouse v. Plantier*, 182 F.3d 192, 198–99 (3d Cir.1999) (recognizing that for some insulin-dependent diabetics the persistent failure to monitor blood sugar levels might be deliberate indifference).

Concluding that Derfiny has alleged facts which, if true, would show the violation of a constitutional right as to each of the individual doctors, I would also find that the right was clearly established at the time of the events such that a reasonable official would have understood his conduct violated the right. *Comstock*, 273 F.3d at 711.

The doctors come close to arguing that unless they had failed to give Derfiny his insulin, they could not be found to have violated a clearly established right. I disagree. The law at the time of Derfiny's incarceration at the Oakland Jail clearly established Derfiny's right to medical treatment for his diabetes. *See e.g., Hunt*, 199 F.3d 1220; *Egebergh*, 272 F.3d 925. Moreover, if a doctor knows that not testing a person's blood glucose could place him at risk of serious symptoms, but does not order the testing of the blood glucose, the doctor has treated the patient with deliberate indifference. *LeMarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir.2001). Based on this case law, I would conclude that the Jail's doctors would have understood that they had a duty to provide medical treatment for a diabetic inmate, including for some diabetic inmates the need for routine blood level checks.[5] Therefore, I would affirm the district court's denial of summary judgment with respect to the Doctors Sheesley, Johnson, and Purchase.

## IV. CONCLUSION

For the forgoing reasons, I respectfully dissent. I would DISMISS the Doctors' appeal. Alternatively, I would AFFIRM

5. The Doctors argue that an unpublished Sixth Circuit case, *Hall v. Beeler*, No. 96–6182, 1997 WL 539691 (6th Cir.1997), suggests that the right was not clearly established. However, I find *Hall* inapposite. In *Hall*, the inmate did not allege that he was a brittle diabetic who took insulin on a sliding scale and required daily blood level checks. In fact, the court did not even mention whether or not the inmate received blood level checks during his incarceration.

the district court's denial of qualified immunity for the above-mentioned reasons.