**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 13, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

SEIFULLAH CHAPMAN,

    Plaintiff - Appellee,

v.

GEORGE SANTINI, MD,
individually; ANTHONY OSAGIE,
PA, individually; RONALD
CAMACHO, PA, individually,

    Defendants - Appellants,

and

FEDERAL BUREAU OF PRISONS,

    Defendant.

No. 18-1117
(D.C. No. 1:15-CV-00279-WYD-KLM)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

Before **HOLMES**, **McKAY**, and **CARSON**, Circuit Judges.

---

At all relevant times (approximately February 2013 to August 2015),

Seifullah Chapman was a prisoner at Administrative Maximum ("ADX") in

---

[*]     This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Florence, Colorado, reputedly the most secure and restrictive prison operated by the Bureau of Prisons. Mr. Chapman has a severe form of Type 1 diabetes. While incarcerated at ADX, he was treated by three prison medical professionals: Dr. George Santini, Anthony Osagie, and Ronald Camacho (the "Medical Professionals"). In this *Bivens* action,[1] Mr. Chapman alleges that each Medical Professional violated the Eighth Amendment by acting with deliberate indifference to his serious medical needs. The Medical Professionals deny any wrongdoing and invoke qualified immunity.

We must decide whether the Medical Professionals are entitled to qualified immunity. In doing so, we must resolve two questions: (1) whether any of the Medical Professionals violated the Eighth Amendment, and (2) if so, whether then-extant law clearly established the unconstitutionality of their conduct. In denying the Medical Professionals' motion for summary judgment, the district court answered both questions in the affirmative.

The Medical Professionals appeal from that order. The parties are familiar with the facts and the procedural history. As to such matters, we offer details

---

[1]    In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)).

only in connection with our disposition of the issues presented in this appeal. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

**I**

Before we can turn to the merits of the Medical Professionals' appeal, "we must first ensure we have jurisdiction." *Perry v. Durborow*, 892 F.3d 1116, 1119 (10th Cir. 2018). Mr. Chapman has moved to dismiss this appeal for lack of appellate jurisdiction. The Medical Professionals respond that we do have jurisdiction. We agree with the Medical Professionals: we do have jurisdiction.

As a general rule, we lack jurisdiction over denials of summary judgment. *See Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014); *accord Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1150 (10th Cir. 2006). The collateral-order doctrine is an exception to that general rule; it allows appellate courts to review "a limited set of district-court orders" even though the orders are "short of final judgment." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996)). In particular, orders denying qualified immunity at the summary-judgment stage qualify for this special jurisdictional treatment, *see, e.g.*, *Plumhoff*, 572 U.S. at 771, but in appeals from such orders, we are limited to review of "the district court's abstract legal conclusions," *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 878 (10th Cir. 2014); *accord Fancher v. Barrientos*, 723 F.3d 1191, 1198 (10th Cir. 2013).

Notably, we generally lack interlocutory jurisdiction when a district court denies qualified immunity based on a determination that there are "genuine" disputes of material fact for trial. *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995); *see Cox v. Glanz*, 800 F.3d 1231, 1242 (10th Cir. 2015) (noting that whether "'the pretrial record sets forth a "genuine" issue of fact for trial' is *not* an abstract legal question" (quoting *Johnson*, 515 U.S. at 320)). An exception to this general rule applies when a district court fails to specify which factual disputes preclude the grant of summary judgment based on qualified immunity. *See Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) ("[W]hen the district court at summary judgment fails to identify the particular charged conduct that it deemed adequately supported by the record, we may look behind the order denying summary judgment and review the entire record *de novo* to determine for ourselves as a matter of law which factual inferences a reasonable jury could and could not make.").

Therefore, "[i]f a district court does not state the facts a reasonable jury could find at summary judgment, 'a court of appeals may have to undertake a cumbersome review of the record to determine [those] facts.'" *Id.* (quoting *Johnson*, 515 U.S. at 319); *accord Roosevelt-Hennix v. Prickett*, 717 F.3d 751, 756 n.8 (10th Cir. 2013); *see Armijo ex rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1259 (10th Cir. 1998) (noting that "if the district court concludes

4

that a genuine issue of material fact exists in denying qualified immunity, but does not set forth with specificity the facts presented by the plaintiff that support a finding that the defendant violated a clearly established right, then we may look behind the order denying summary judgment"). "In such circumstances, but only in such circumstances, we may review the entire record, construing the evidence in the light most favorable to the plaintiff, and determine de novo whether the plaintiff in fact presented sufficient evidence to forestall summary judgment on the issue of qualified immunity." *Armijo*, 159 F.3d at 1259.

This case requires such a record review. Although the district court denied summary judgment because of "genuine issues of material facts," Aplts.' App., Vol. XX, at 3334–35 (Order Den. Summ. J., filed Jan. 25, 2018), it did not explicitly identify the material facts in dispute.[2] Moreover, this is not a situation where the defendants dispute our obligation to construe any facts found in the light most favorable to the plaintiff. *Cf. Castillo v. Day*, 790 F.3d 1013, 1018 (10th Cir. 2015) ("Although [Defendant] attempts to characterize the issue on

---

[2] The district court identified the following genuine issues of material fact, without specifying the facts that precluded the grant of summary judgment: (1) whether the Medical Professionals appropriately administered Mr. Chapman's insulin, (2) whether the Medical Professionals provided Mr. Chapman with appropriate medical supplies to manage his diabetes, and (3) whether the Medical Professionals appropriately responded to Mr. Chapman's symptoms and complaints regarding his Type 1 diabetes and whether Mr. Chapman suffered serious harm or substantial risk of serious harm. The district court provided no further detail.

5

appeal as Plaintiffs' failure to assert a violation of a constitutional right under clearly established law, her argument is limited to a discussion of *her version of the facts* and the inferences that can be drawn therefrom. Thus, [Defendant's] argument is actually a challenge to the district court's conclusion Plaintiffs presented sufficient evidence to survive summary judgment. As such, this court lacks jurisdiction to review her appeal at the interlocutory stage." (emphasis added) (footnote omitted)). Indeed, the Medical Professionals expressly acknowledge that "all disputed facts must be resolved in the light favorable to [Mr. Chapman]." Aplts.' Resp. to Aplee.'s Mot. to Dismiss at 4 (filed July 26, 2018). And they purport to do so in their opening brief. *See* Aplts.' Opening Br. at 6.

In light of these circumstances, we do have jurisdiction over this interlocutory appeal. Mr. Chapman's motion to dismiss is **denied**. We proceed to the merits.

## II

Qualified immunity "shields officials from civil liability." *Mullenix v. Luna*, --- U.S. ----, 136 S. Ct. 305, 308 (2015) (per curiam). But it is more than "a mere defense to liability"; it is also "an immunity from suit." *Plumhoff*, 572 U.S. at 771–72 (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Indeed, qualified immunity exists largely "to ensure that '"insubstantial claims" against

6

government officials [will] be resolved prior to discovery.'" *Pearson*, 555 U.S. at 231 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)). That said, the qualified-immunity shield protects officials only when their "conduct 'does not violate clearly established statutory or constitutional rights.'" *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix*, 136 S. Ct. at 308). More specifically, a plaintiff may defeat a claim of qualified immunity by making two showings: First, that "the defendant violated a constitutional right." *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (quoting *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011)). And second, that "the constitutional right was clearly established." *Id.* (quoting *Koch*, 660 F.3d at 1238).

A constitutional right is clearly established if its contours are "'sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alteration in original) (quoting *Anderson*, 483 U.S. at 640). Although the Supreme Court does "not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* This purposefully "demanding standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *District of Columbia v. Wesby*, --- U.S.

7

----, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The plaintiff bears the burden to meet each part of the qualified-immunity test. *See id.* at 591; *accord Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). We may take up either part first. *See Pearson*, 555 U.S. at 236. We review the district court's legal conclusions—such as whether the defendants violated a constitutional right and whether that right was clearly established—de novo. *See, e.g.*, *Felders*, 755 F.3d at 877.

### III

"[E]lementary principles" of humanity embodied in the Eighth Amendment "establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976). Prison officials betray that obligation by acting with "deliberate indifference to an inmate's serious medical needs." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005).

Deliberate indifference has "both an objective and a subjective component." *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000)). To satisfy the objective component, a prisoner must prove that the alleged deprivation was "sufficiently serious." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A delay in medical care is sufficiently serious if "the

delay resulted in substantial harm." *Id.* (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). "[S]everal hours of untreated severe pain" counts as substantial harm. *Al-Turki v. Robinson*, 762 F.3d 1188, 1194 (10th Cir. 2014). The subjective component requires that a defendant act with "a sufficiently culpable state of mind." *Redmond*, 882 F.3d at 936 (quoting *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1289 (10th Cir. 1999)). A defendant has the necessary state of mind if he knew an inmate "faced a substantial risk of harm and disregarded that risk." *Id.* at 939 (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088–89 (10th Cir. 2009)). An inmate need not prove the defendant had actual knowledge of the danger or actually intended that harm befall the inmate. *See Mata*, 427 F.3d at 752. Rather, it is enough that circumstantial evidence supports an inference that a defendant failed to verify or confirm a "risk that he strongly suspected to exist." *Id.* (quoting *Farmer*, 511 U.S. at 843 n.8).

Construing the record facts in the light most favorable to Mr. Chapman, we conclude that each Medical Professional violated his Eighth Amendment rights. By way of overview, Mr. Chapman has a severe form of Type 1 diabetes that requires specialized medical care. His condition is so dire that his former military doctor, Dr. Shakir, wrote a letter to future medical providers warning that "Mr. Chapman is at a very high risk for diabetes ketoacidosis and hypoglycemia" and that "these disorders have 10 to 15 % [sic] mortality rate[s] if not treated

9

immediately." Aplee.'s Suppl. App., Vol. VII, at 1021 (Dr. Shakir Letter, dated

Nov. 2, 2012). Adequate treatment, he added, requires at least three, and up to

six, shots of insulin every day. *Id.* Furthermore, an expert opined that, without

adequate care for his diabetes, Mr. Chapman's "life is constantly in danger." *Id.*,

Vol. VI, at 879 (Expert Report, dated Sept. 7, 2016).

There is considerable record evidence that the Medical Professionals

provided Mr. Chapman with care "dramatically short of medically acceptable

standards of care, even for prisoners." *Id.* While at ADX, Mr. Chapman suffered

serious bouts of hypoglycemia and hyperglycemia multiple times a week—often

several days in a row—as well as multiple life-threatening bouts of extreme

hypoglycemia. *See id.*, Vol. XXII, at 2235–80 (BOP Health Services Report, filed

Oct. 10, 2017).[3] As one expert remarked, "[e]very physician knows . . . that

poorly controlled diabetes risks death." *Id.* at 2285 (Expert Report, dated Oct. 4,

---

[3]      "The normal range for blood sugar levels is between 70 and 180 milligrams per deciliter (mg/dl)." Aplee.'s Suppl. App., Vol. VI, at 869. "Hyperglycemia occurs when blood sugar levels are too high." *Id.* at 870. While at ADX, Mr. Chapman's blood sugar levels were frequently in the high 200s and 300s. *See id.*, Vol. XXII, at 2235–80. "Hypoglycemia occurs when blood sugar levels drop below 70 mg/dl." *Id.*, Vol. VI, at 869. For a person with Type 1 diabetes, blood sugar levels below 30 mg/dl are life-threatening. *Id.* at 870. At this level, "brain damage, loss of consciousness, seizure, and death" may occur. *Id.* In a little over two years at ADX, Mr. Chapman's blood sugar levels were measured at below 30 mg/dl on approximately ten separate occasions. *See id.*, Vol. XXII, at 2235–80. His blood sugar level was measured in the 30s on approximately twenty-two additional times. *See id.*

2016). Yet, at ADX, Mr. Chapman's diabetes was so "poorly controlled" that it may have caused some "brain injury." *See id.* In the end, the record strongly suggests that Mr. Chapman's care at ADX was "contrary to . . . basic human rights and the community standards of care." *Id.*, Vol. VI, at 879. And the record supports sufficient inferences that each Medical Professional acted with a culpable state of mind by disregarding a substantial risk of harm to Mr. Chapman.

To be sure, we are aware of the repeated suggestions of the Medical Professionals that some of the failings of medical care Mr. Chapman complains of were not attributable to their bad intentions, but, rather, to shortages of medical staff and security considerations that are particularly acute in a high-security penal facility like ADX. *See, e.g.*, Aplts.' Opening Br. at 5 (noting that ADX has "an uncommon level of security and has unique security and control procedures"); *id.* at 27 ("There were numerous issues outside of Osagie and Camacho's control, relating to the unique security protocols at ADX, which sometimes delayed pill line."); *id.* at 28 ("Both Osagie and Camacho stated that they never intentionally delayed pill line and tried to complete pill line as soon as possible, but they acknowledged that there were sometimes delays because of issues that were outside of their control.").

Although we do not gainsay or diminish the seriousness of such institutional considerations, we must construe the summary-judgment record in

the light most favorable to Mr. Chapman. *See, e.g.*, *Armijo*, 159 F.3d at 1259; *see also Zia v. Tr. Co. ex rel Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010) ("Our analysis of course [of the summary-judgment record] only accounts for the plaintiffs' version of events, a version which a jury may later reject. However, under this version we agree with the district court that the plaintiffs have met their burden of showing a constitutional violation."). And, if the record so construed raises triable inferences that each of the Medical Professionals acted with the requisite culpable intent under the Eighth Amendment, then the alleged institutional constraints of ADX will not preclude a denial of their qualified-immunity defenses. *Cf. Ramos v. Lamm*, 639 F.2d 559, 578 (10th Cir. 1980) (where prison-administrator defendants sued for injunctive relief blamed the provision of allegedly inadequate prisoner medical care on staffing shortages, holding that those shortages did not excuse such care; instead, they "evince[d] . . . a deliberate indifference to the serious health needs of the prison population"); *cf. also Toussaint v. McCarthy*, 801 F.2d 1080, 1093 (9th Cir. 1986) ("The state has no right to subject a prisoner to cruel and unusual punishment. The [E]ighth [A]mendment is not a 'maybe' or a 'sometimes' proposition. If conditions violate the [E]ighth [A]mendment, all prisoners have the right to be free of such conditions. The right does not vary depending on the threat that the individual prisoner presents to institutional security."), *abrogated on other grounds*, *Sandin*

12

*v. Conner*, 515 U.S. 472 (1995). In other words, irrespective of the institutional constraints associated with ADX, if the Medical Professionals acted with deliberate indifference, within the meaning of our precedent, to Mr. Chapman's serious medical needs, they violated his Eighth Amendment rights.

We recognize that *Bivens* liability is personal; Mr. Chapman must establish that each Medical Professional personally violated his Eighth Amendment rights. *See, e.g.*, *Pahls v. Thomas*, 718 F.3d 1210, 1225–26 (10th Cir. 2013) ("Because [42 U.S.C.] § 1983 and *Bivens* are vehicles for imposing personal liability on government officials, we have stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants. . . . [I]t is incumbent upon a plaintiff to 'identify *specific* actions taken by *particular* defendants' in order to make out a viable § 1983 or *Bivens* claim." (citations omitted) (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998)); *accord Glaser v. City and Cty. of Denver*, 557 F. App'x 689, 702 (10th Cir. 2014) (unpublished)). Examining the objective and subjective components of the deliberate-indifference standard, we conclude that Mr. Chapman has made this individualized showing of Eighth Amendment violations.

**A**

The record shows that each Medical Professional caused Mr. Chapman substantial harm, thereby satisfying the objective component. Mr. Osagie did so

13

on March 18, 2013. By the time Mr. Osagie arrived with Mr. Chapman's insulin, Mr. Chapman was having an episode of severe hyperglycemia. When his blood sugar is that high, Mr. Chapman says his "blood feels like it's on fire." Aplee.'s Suppl. App., Vol. VI, at 848 (Expert Report, dated Nov. 21, 2016). And as Mr. Osagie admitted, hyperglycemia can cause a diabetic to "go into a coma. They can die from it, ultimately." *Id.* at 656 (Tr. of Osagie Dep., dated May 17, 2016). To alleviate the pain and lower his blood sugar to a safe level, Mr. Chapman needed sliding scale insulin. *See* Aplts.' Opening Br. at 25. But Mr. Osagie did not bring the sliding scale insulin. And he waited over two hours before returning with it. *See* Aplts.' App., Vol. XI, at 1694–95 (Pl.'s Narrative Note, dated Mar. 18, 2013). When Mr. Osagie did return and Mr. Chapman complained, Mr. Osagie replied, "It's not my problem, it's not my fault." Aplts.' Opening Br. at 26. Yet, for those two hours and twenty minutes, Mr. Chapman was in substantial pain. By prolonging that pain and exacerbating the risk of coma and death, Mr. Osagie inflicted substantial harm on Mr. Chapman sufficient to satisfy the objective component. *Cf. Al-Turki*, 762 F.3d at 1193 (holding that prolonging severe abdominal pain satisfied objective component); *Sealock*, 218 F.3d at 1210 (holding that delay in treating chest pain satisfied objective component).

Mr. Camacho, too, inflicted substantial harm. On one occasion, Mr. Chapman twice complained to guards that he was "in pain" or "in serious pain"

14

from severe hyperglycemia.  Aplts.' App., Vol. XVI, at 2322 (Pl.'s Narrative Note, dated June 6, 2013).  When Mr. Camacho arrived—about two hours and forty-five minutes after Mr. Chapman's initial complaint—Mr. Chapman explained that he experiences "extreme pain" when his blood sugar is high and that he "had been asking for help for hours."  *Id.*  Unmoved, Mr. Camacho replied that he was not "worried about" Mr. Chapman's blood sugar "being high" because he knew someone who had extremely high blood sugar (i.e., multiple times the threshold for hyperglycemia) who "survived."  *Id.*  Those hours of "unnecessary pain" satisfy "the objective component."  *Mata*, 427 F.3d at 755; *see Lolli v. County of Orange*, 351 F.3d 410, 419–20 (9th Cir. 2003) (noting that diabetes "can produce harmful consequences if left untreated for even a relatively short period of time" and "join[ing] our sister circuits in acknowledging that a constitutional violation may take place when the government does not respond to the legitimate medical needs of a detainee whom it has reason to believe is diabetic").

The records shows that Dr. Santini also caused Mr. Chapman substantial harm.  "Every physician knows . . . that poorly controlled diabetes risks death."  Aplee.'s Suppl. App., Vol. XXII, at 2285.  Under Dr. Santini's care, Mr. Chapman's severe diabetes was "poorly controlled."  *Id.*  As is clearly reflected in his medical records, Mr. Chapman suffered serious bouts of hypoglycemia and

15

hyperglycemia multiple times a week, as well as several bouts of hypoglycemia that were life-threatening. *See id.* at 2235–80. Dr. Shakir warned that Mr. Chapman "[wa]s at a very high risk for diabetes ketoacidosis and hypoglycemia" and needed up to six shots of insulin every day. *Id.*, Vol. VII, at 1021. Dr. Santini, however, provided a level of care that one expert called "dramatically short of medically acceptable standards . . . , even for prisoners." *Id.*, Vol. VI, at 879. Such shoddy care exposed Mr. Chapman to possible "brain injury" and "vision problems," and contributed to painful hyperglycemia and life-threatening hypoglycemia. *Id.*, Vol. XXII, at 2285; *id.*, Vol. VI, at 877; *id.* at 870; *id.*, Vol. XXII, at 2235–80.

Simply put, the record suggests that Dr. Santini caused Mr. Chapman substantial harm. *See Scinto v. Stansberry*, 841 F.3d 219, 229 (4th Cir. 2016) ("Plaintiff has created a genuine issue of material fact regarding whether Dr. Phillip's failure to provide him with insulin was an 'extreme deprivation' resulting in 'a serious or significant physical or emotional injury' or 'a substantial risk' thereof actionable under the Eighth Amendment."); *cf. Derfiny v. Pontiac Osteopathic Hosp.*, 106 F. App'x 929, 934–35 (6th Cir. 2004) (unpublished) (remanding to district court to consider defendants' request for qualified immunity, but opining that physicians' continuation of inmate's standard insulin regimen—without measuring his blood sugar levels—presented a genuine dispute

16

of material fact as to objective component, because it was "well known" that inmate had Type I diabetes, and his "history of erratic blood sugar levels" was documented).

**B**

Now for the subjective component. Recall that this component requires that a defendant act with "a sufficiently culpable state of mind." *Redmond*, 882 F.3d at 936 (quoting *Giron*, 191 F.3d at 1289). A defendant has the necessary state of mind if he knew an inmate "faced a substantial risk of harm and disregarded that risk." *Id.* at 939 (quoting *Beggs*, 563 F.3d at 1088–89). An inmate need not prove that the defendant had actual knowledge of the danger or actually intended that harm befall the inmate. *See Mata*, 427 F.3d at 752. Rather, it is enough that circumstantial evidence supports an inference that a defendant failed to verify or confirm a "risk that he strongly suspected to exist." *Id.* (quoting *Farmer*, 511 U.S. at 843 n.8).

The record supports sufficient inferences that each Medical Professional acted with a culpable state of mind by disregarding a substantial risk of harm to Mr. Chapman. Mr. Osagie knew that diabetics "can go into a coma" and "die from" severe hyperglycemia. Aplee.'s Suppl. App., Vol. VI, at 656. Mr. Camacho knew that hyperglycemia carries risks of slower blood flow to "several vital organs," including the brain, heart, and kidneys, and can cause diminished

17

functioning in each of these organs. *Id.* at 629–30 (Tr. of Camacho Dep., dated July 25, 2016). Both men knew "that hypoglycemia can be dangerous in the short-term due to the possibility of . . . coma or potentially death." *Id.*, Vol. XV, at 1825 (Camacho Decl., dated July 19, 2017); *see also id.*, Vol. VI, at 653. Furthermore, they knew that Mr. Chapman's "sugars go stupid" when his insulin is delivered outside of the normal schedule. *See* Aplts.' App., Vol. X, at 1253 (Email from Osagie to Camacho and Others, sent Apr. 1, 2013). But they still delivered Mr. Chapman's insulin late. *See id.* at 1247–48 (Osagie Decl., dated July 19, 2017); Aplee.'s Suppl. App., Vol. XV, at 1822–25. And when they found Mr. Chapman in the throes of severe bouts of hyperglycemia, they waited hours to bring the insulin necessary to alleviate Mr. Chapman's pain. *See* Aplts.' App., Vol. XI, at 1694–95; *id.*, Vol. XVI, at 2322. Their inaction in the face of this known danger is deliberate indifference. *See Mata*, 427 F.3d at 759.

Dr. Santini also acted with a culpable state of mind by disregarding a substantial risk of harm to Mr. Chapman. Dr. Santini, like "[e]very physician," knew "that poorly controlled diabetes risks death." Aplee.'s Suppl. App., Vol. XXII, at 2285. Dr. Santini knew "Mr. Chapman's blood [sugar levels] were all over the board." *Id.* at 2307 (Tr. of Santini Dep., dated May 9, 2016). But Dr. Santini failed to prescribe more insulin shots or otherwise adjust Mr. Chapman's treatment. *Id.* at 2303. The reason for this inaction? Dr. Santini claimed that

18

"had any serious issues been brought to [his] attention . . . , [he] would have taken steps to address [them]." Aplts.' App., Vol. X, at 1272 (Santini Decl., dated July 19, 2017). But the record proves that Mr. Chapman had brought serious issues to Dr. Santini's attention. He told Dr. Santini about his "out of control blood sugar." *Id.*, Vol. XVI, at 2283–84 (Chapman Decl., dated Sept. 15, 2017). He even "tried to show [Dr. Santini] [his] blood sugar logs but [Dr. Santini] refused to look at them." *Id.* at 2284. What's more, Dr. Santini admitted that he reviewed Mr. Chapman's official medical records before each appointment. Aplee.'s Suppl. App., Vol. XXII, at 2309. Those records clearly reveal that Mr. Chapman repeatedly experienced life-threatening bouts of hypoglycemia and serious bouts of hyperglycemia. *See id.* at 2235–80.

In short, Mr. Chapman told Dr. Santini about a serious problem, and the medical records that Dr. Santini acknowledged reviewing confirmed that problem. But still Dr. Santini did nothing. This inaction would permit a finding that the subjective component was satisfied. *See Hunt v. Uphoff*, 199 F.3d 1220, 1223–24 (10th Cir. 1999) (holding that a prisoner sufficiently alleged deliberate indifference—as opposed to a mere disagreement over proper medical treatment—where a prison doctor refused to prescribe him insulin, and ultimately, the inadequate treatment of his diabetes and hypertension caused him to suffer a heart attack); *see also Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 498–501

19

(1st Cir. 2011) (holding that medical professional's conduct satisfied the subjective component where he knew prisoner suffered from HIV and various HIV symptoms, but failed to read critical report relating to inmate's "viral load" in order to avoid the obligation to provide the inmate appropriate—but costly—medical care); *cf. Derfiny*, 106 F. App'x at 936 ("Despite [physician] Defendants' knowledge of the available information, by administering drugs to a patient without assessing his need, [physician] Defendants Johnson and Purchase acted with deliberate indifference to Plaintiff's substantial risks.").

Furthermore, recall that Dr. Shakir had written a letter warning future medical providers, such as Dr. Santini, that Mr. Chapman "is at a very high risk for diabetes ketoacidosis and hypoglycemia" and that he needs up to six shots of insulin every day. Aplee.'s Suppl. App., Vol. VII, at 1021. This warning letter should have bolstered the credibility of Mr. Chapman's own reports of his serious, diabetes-related health problems and, along with all of the other red flags outlined above, strongly suggested to Dr. Santini that Mr. Chapman was experiencing serious ongoing harm. And, because of these many red flags, we cannot say that Mr. Chapman's complaints about Dr. Santini's care amounted to nothing more than "a mere disagreement as to his medical treatment." *Hunt*, 199 F.3d at 1223.

20

In sum, viewing his conduct in the totality, we conclude that, as to Dr. Santini, the subjective component is satisfied. *Scinto*, 841 F.3d at 229 (holding that refusing to prescribe supplemental insulin while aware of prisoner's diabetes diagnosis, blood sugar levels, and need for insulin met subjective component); *Cf. Oxendine*, 241 F.3d at 1278–79 (prison doctor's two-week delay in obtaining specialized treatment—after personally recording evidence that prisoner's reattached finger was decaying—met subjective component).

## IV

Thus, each Medical Professional violated the Eighth Amendment by acting with deliberate indifference to Mr. Chapman's serious medical needs. But did they violate *clearly established* law? Yes. Our existing precedent put the unconstitutionality of each Medical Professional's conduct beyond debate. *See, e.g., al-Kidd*, 563 U.S. at 741 ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." (alteration in original) (quoting *Anderson*, 483 U.S. at 640)).

21

As it relates to the liability of Dr. Santini, our decision in *Hunt* is most on-point. There, a prison doctor had prescribed insulin for an inmate with diabetes and hypertension. *Hunt*, 199 F.3d at 1223. Despite the previous prescription, another doctor "did not believe" that the inmate needed insulin and thus did not provide it for over a year. *Id.* But the inmate was not totally denied treatment; he saw doctors, got prescriptions, and had medical procedures. *Id.* at 1222–23. Even so, the inmate eventually died "of acute blockage of [his] coronary artery bypass graft." *Id.* at 1223. The district court concluded that the second doctor did not act with deliberate indifference. *Id.* We reversed that order. *Id.* at 1224. Although that doctor believed (wrongly) that the inmate did not need insulin, we could "not agree with the district court that the facts *as alleged* . . . reflect[ed] a 'mere disagreement with [the] medical treatment.'" *Id.* (emphasis added) (quoting the appellate record).

So too here. As in *Hunt*, one doctor (i.e., Dr. Shakir) thought an inmate needed a certain insulin prescription. Aplee.'s Suppl. App., Vol. VII, at 1021. Like *Hunt*, another doctor (i.e., Dr. Santini) disagreed and withheld the necessary amount of insulin, *id.*, Vol. XXII, at 2303, though the inmate did receive other medical treatment over that period. As in *Hunt*, the inmate suffered adverse health consequences due to a lack of sufficient insulin. *See id.* at 2235–80. Simply put, given Mr. Chapman's wild swings in blood sugar—of which Dr.

22

Santini was aware—a reasonable official in Dr. Santini's position would have known that denying Mr. Chapman adequate insulin violated the Eighth Amendment. *Hunt* clearly established as much. *See Lolli*, 351 F.3d at 420 (citing *Hunt* for proposition that an official who fails to "respond to the legitimate medical needs of a [prisoner] whom it has reason to believe is diabetic" violates the Eighth Amendment).

As for Messrs. Osagie and Camacho, let's consider *Al-Turki*. In that case, an inmate with Type 2 diabetes "began to feel severe pain in his left side." *Al-Turki*, 762 F.3d at 1191. The inmate sent multiple correctional officers to tell a prison nurse about his pain. *Id.* But the nurse refused to see him "because it was too late and because [his] complaint was not an emergency." *Id.* As a result, the inmate endured "several hours of untreated severe pain." *Id.* at 1194. We held that the nurse violated clearly established law by prolonging the inmate's pain and leaving him without care for hours during a potential "medical emergency." *Id.* at 1195 (quoting *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006)).

Mr. Osagie and Mr. Camacho did something similar. They encountered Mr. Chapman during bouts of severe hyperglycemia, a medical emergency which, if left untreated, can result in a coma or death. *See, e.g.*, Aplee.'s Suppl. App., Vol. VI, at 656. But rather than treat that emergency promptly, they delayed for hours. *See* Aplts.' App., Vol. XI, at 1694–95; *id.*, Vol. XVI, at 2322. As in *Al-*

23

*Turki*, their conduct violated clearly established law. *See Al-Turki*, 762 F.3d at 1194–95 (holding that "[i]t has been clearly established in this circuit since at least 2006 that a deliberate indifference claim will arise when 'a medical professional completely denies care although presented with recognizable symptoms which potentially create a medical emergency,'" and that defendant's actions constituted such behavior (quoting *Self*, 439 F.3d at 1232)).

*Sealock* also put the constitutional question facing Mr. Osagie and Mr. Camacho beyond debate. There, the inmate awoke with "a crushing pain in his chest." 218 F.3d at 1208. The inmate told Sergeant Barrett about his pain and fear that he was "having a heart attack." *Id.* Sergeant Barrett "refused to transport [the inmate] immediately to a doctor or a hospital because it was snowing outside and it would take time to warm up the prison van for transportation." *Id.* at 1210. He then told the inmate "not to die on his shift." *Id.* "Barrett's failure to get [the inmate] treatment" caused him "several hours" of "pain and suffering." *Id.* Thinking the inmate could not "show that the delay in receiving medical treatment caused him any injury," the district court granted Sergeant Barrett's motion for summary judgment. *Id.* at 1209–10. We reversed. *Id.* at 1211. Although Sergeant Barrett did not cause the pain, there was evidence to show that "the delay occasioned by his inaction unnecessarily prolonged [the inmate's] pain and suffering." *Id.* at 1210 n.5. And we held that Sergeant

24

Barrett's delay in the face of "symptoms consistent with a heart attack" violated the Eighth Amendment. *Id.* at 1210–11.

The same principle applies here. Mr. Osagie and Mr. Camacho each found Mr. Chapman in the midst of a medical emergency that could result in a coma or death, Aplee.'s Suppl. App., Vol. VI, at 656, but delayed treating him for hours, *see* Aplts.' App., Vol. XI, at 1694–95; *id.*, Vol. XVI, at 2322. Mr. Osagie dismissed Mr. Chapman's predicament, saying, "It's not my problem." Aplts.' Opening Br. at 26. Mr. Camacho responded that he was "not worried about" Mr. Chapman's blood sugar "being high" because he knew someone who had extremely high blood sugar (i.e., multiple times the threshold for hyperglycemia) who "survived." Aplts.' App., Vol. XVI, at 2322. Under our clearly established law, this conduct is unconstitutional.

In sum, each Medical Professional violated clearly established law. Our precedent put the constitutional question facing each Medical Professional beyond debate. And looking outside our circuit confirms that conclusion. *See, e.g.*, *Garretson v. City of Madison Heights*, 407 F.3d 789, 798–99 (6th Cir. 2005) (holding that officer who knew of detainee's diabetes and delayed insulin violated clearly established law); *Lolli*, 351 F.3d at 420–22 (holding that officers who withheld insulin from diabetic violated clearly established law); *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999) (holding that prison official and

25

doctor violated Eighth Amendment by delaying diabetic's doctor visit and keeping inmate on medication despite complaints about adverse reactions, respectively).

*   *   *

It goes without saying that "[t]he Constitution 'does not mandate comfortable prisons.'" *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).  But nor "does it permit inhumane ones." *Id.*  It is our job to judge when the facts in the record indicate that the line separating uncomfortable from inhumane has been crossed.  At a later stage in this proceeding, a factfinder may well conclude that the line was not crossed.  But, at the summary-judgment stage, we conclude that under our precedent each of the Medical Professionals violated Mr. Chapman's Eighth Amendment rights under clearly established law.  Accordingly, we **AFFIRM** the district court's judgment.

ENTERED FOR THE COURT


Jerome A. Holmes
Circuit Judge